## GUESSEFELDT v. McGRATH et al.
### No. 5153–49.

United States District Court.
District of Columbia.
March 14, 1950.

Robert F. Klepinger, of Washington, D. C., for plaintiff.

Walter T. Nolte and Oliver Dibble, of the Department of Justice, Washington, D. C., for defendants.

TAMM, District Judge.

Plaintiff brings this action for return of property seized under the "Trading With The Enemy Act", 50 U.S.C.A.Appendix, § 1 et seq., hereinafter referred to as the Act. The Government having moved to dismiss thereby concedes the following well pleaded facts:

Plaintiff was born in Germany in 1870 and moved to Hawaii in 1896 where he has since resided. In April 1938 plaintiff, accompanied by his wife and daughter, who is a citizen of the United States, left Hawaii for a trip to Germany. Permits were issued to them to re-enter the United States, which permits, as extended, expired in March 1940. Following the outbreak of World War II in September 1939, plaintiff and his family were unable to secure return passage to Hawaii within the period referred to in said re-entry permits. On the contrary they were compelled to remain involuntarily in Germany during hostilities. Plaintiff's daughter returned to the United States in January 1947, but plaintiff and his wife were unable to return until July 1949. During his enforced stay in Germany, plaintiff did not own property of any kind there, purchased no war bonds or other securities, did not vote in any elections, did not engage in any efforts directly or indirectly in aid of or assistance to the war effort of Germany or of any enemy or ally of an enemy of the United States, nor was he ever directly or indirectly employed by or in the service of any government which was an enemy of the United States and never committed any act hostile or inimical to the interests of the United States. Plaintiff's entire estate was included in a deed of trust with the Bishop Trust Company, Ltd. of Honolulu, Hawaii, executed in 1934, amended by trust deed of January 18, 1938, and during his absence from Hawaii plaintiff's household goods, books and similar personalty were in storage with the City Transfer Company, Ltd. of Honolulu, Hawaii. On his departure from Hawaii, plaintiff took with him to cover expenses of his trip, the sum of $6,500 and when his return was made impossible, in June 1940 he withdrew $6,000 from the trust fund and again in May 1941 he withdrew an additional $4,000 therefrom.

On February 5, 1948 and May 12, 1949, the then duly appointed and qualified Director of the Office of Alien Property, acting under the said Act and Executive Orders No. 9193, July 6, 1942, as amended, and No. 9788, 50 U.S.C.A.Appendix, § 6 note, issued Vesting Orders No. 10616, 13 Fed.Reg. 702, 703, and No. 13253, 14 Fed.Reg. 2887, 2888, respectively. Said Orders vested in the Attorney General all of plaintiff's property therein described, being the property under the aforesaid trust agreement of May 11, 1934, as amended, including all accrued income therefrom, and all personalty stored with the aforesaid Transfer Company in Honolulu, "to be held, used, administered, liquidated, sold or otherwise dealt with in the interest of and for the benefit of the United States."

On August 27, 1948, said Trust Company delivered to the defendants the sum of $24,018.75 in cash, being the net income accruing from said trust estate as of June 30, 1948 and said sum is now in the possession of the defendant Treasurer of the United States.

On January 24, 1949 said Trust Company notified the Director of the Office of Alien Property that it would not make further payments of such accrued income in the future and also demanded return of said sum theretofore paid, which demand has not been acknowledged or complied with.

On July 18, 1949 plaintiff filed with the Director of the Office of Alien Property, a claim under oath in conformity with the requirements of said Director (Form APC-1A), demanding the return of said property and estate, but no application therefor was made to the President of the United States and neither property nor estate has been returned to the plaintiff.

On November 2, 1949 plaintiff and his wife filed their declarations of intention to become naturalized citizens of the United States and on December 9, 1949 they received there first papers (Nos. 78275 and 78274). Since July 1949 plaintiff, his wife and daughter have been staying in Flushing, Long Island, New York, and aside from the wages of their daughter who is employed by a New York department store, plaintiff and his wife are without funds.

In addition to the Government's Motion to Dismiss, plaintiff has filed a Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Plaintiff brings this action under § 9 of the Act[1] on the theory that he is not an enemy or ally of an enemy. Section 2 of the Act defines the terms "enemy" and "ally of enemy", in pertinent part as follows:

"(a) Any individual * * * of any nationality, resident within the territory * * * of any nation with which the United States is at war * * *.

"(c) Such other individuals * * * as may be natives, citizens, or subjects of any nation with which the United States is at war * * * as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term 'enemy.'"

"(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory * * * of any nation which is an ally of a nation with which the United States is at war * * *".

"(c) Such other individuals, or body or class of individuals, as may be natives, citizens, or subjects of any nation which is an ally of a nation with which the United States is at war * * * as the President, if he shall find the safety of the United States or the successful prosecution of the war shall so require, may, by proclamation, include within the term 'ally of enemy.'"

The President never issued any proclamations pursuant to sections (c) above.

▮▮▮▮ Section 5(b) of the Act grants to the President, and to his delegates by Executive Orders issued pursuant thereto, the power to vest the property of a national of a designated enemy country and, of course, the formal declaration of war made Germany an enemy country. The constitutionality of this provision of the Act has been upheld by the Supreme Court in the case of Silesian American Corporation v. Clark, 1947, 332 U.S. 469, 68 S.Ct. 179, 182, 92 L.Ed. 81, wherein Justice Reed wrote: "* * * There is no doubt but that under the war power, as heretofore interpreted by this Court, the United States, acting under a statute, may vest in itself the property of a national of an enemy nation. Unquestionably to wage war successfully, the United States may confiscate enemy property."

The question presented then is whether the plaintiff was an enemy, an ally of an enemy or a national of an enemy country at the time these vesting orders were issued. Technically, of course, plaintiff is a citizen

---

1. "(a) Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed * * * to the Alien Property Custodian * * * may file with the said custodian a notice of his claim under oath * * *" and may thereafter institute suit in equity in the Supreme Court of the District of Columbia [now the United States District Court for the District of Columbia] "to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment * * * or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or the interest therein to which the court shall determine said claimant is entitled."

of Germany, but it cannot very well be argued that he was "resident within the territory * * * of any nation with which the United States is at war" when he was involuntarily detained in Germany during the period of hostilities. It is hornbook law that to effect a change of residence two essentials are necessary, namely: (1) an intention to abandon the old and (2) an intention to remain in the new domicil. As some writers express it, there must be an *animus non revertendi* and an *animus manendi*. Moreover the acts of the person must correspond with such purpose and the change of residence must be voluntary. Morris v. Gilmer, 129 U.S. 315, 9 S.Ct. 289, 32 L.Ed. 690. There is nothing in the record before the Court to indicate that the plaintiff had any such intention when he went from Hawaii to Germany in 1938, or during his sojourn in Germany thereafter.[2] Accordingly, I find and so hold that plaintiff would not have been estopped from recovering under § 9(a) of the Act.

Following World War I, the Courts[3] liberally construed the Act so as to allow recovery of property owned by persons who were free from "enemy taint". But this Court is faced with the fact that on July 3, 1948 the Congress enacted a new section of the Act, 50 U.S.C.A.Appendix, § 39, which provides that: "No property or interest therein of Germany, Japan, *or any national of either such country* vested in or transferred to any officer or agency of the Government at any time after December 17, 1941, pursuant to the provisions of this Act, shall be returned to former owners thereof or their successors in interest, and the United States shall not pay compensation for any such property or interest therein. * * *" (Emphasis supplied.)

The next question to be decided is whether plaintiff was a national of Germany within the intendment of Section 39 of the Act.

██ This Act, being one in which the sovereign consents to be sued, is one of grace and must be strictly construed. It is subject to revision or complete repeal at any time. Lynch v. United States, 292 U.S. 571, 581, 54 S.Ct. 840, 78 L.Ed. 1434. Section 39, in particular, relates to property which had vested in the United States after December 17, 1941 and as was stated by Mr. Justice Butler, speaking for the Court, in Cummings v. Deutsche Bank, 300 U.S. 115, 120, 57 S.Ct. 359, 362, 81 L.Ed. 545: "The title acquired by the United States was absolute and unaffected by definition of duties or limitations upon the power of the Custodian or the Treasurer of the United States. Congress reserved to itself freedom at any time to dispose of the property as deemed expedient and right under circumstances that might arise during and after the war. * * * Congress intended after the war justly to deal with former owners and, by restitution or compensation in whole or part, to ameliorate hardships falling upon them as a result of the seizure of their property. *But that intention detracted nothing from title acquired by the United States or its power to retain or dispose of the property upon such terms and conditions as from time to time Congress might direct.*" (Emphasis supplied.)

By Executive Order No. 8389, 12 U.S.C.A. § 95a note, the term "national" was defined to include, 5E(i): "Any person who has been domiciled in, or a *subject, citizen* or resident of a foreign country at any time on or since the effective date of this Order." (Emphasis supplied.)

This Order was approved by the Congress in a Joint Resolution dated May 7, 1940, 54 Stat. 179, and reaffirmed by §

---

2. This view is supported by many cases including Stadtmuller v. Miller, 2 Cir., 1926, 11 F.2d 732, 45 A.L.R. 895; Vowinckel v. First Federal Trust Co., 9 Cir., 1926, 10 F.2d 19; Opinions of the Attorney General (1922) von Passavant; (1921) Weber; (1922) Goldschmidt; (1921) Haverland; (1921) Hohner and (1920) Jung; Josephberg v. Markham,

2 Cir., 152 F.2d 644; Sarthou v. Clark, D.C.1948, 78 F.Supp. 139; McGrath v. Zander, D.C.Cir.1949, 177 F.2d 649, and see 148 A.L.R. 1423 et seq.

3. Silesian American Corp. v. Clark, 332 U.S. 469, 68 S.Ct. 179, 92 L.Ed. 81; Clark v. Uebersee Finanz Korp., 332 U.S. 480, 481, 68 S.Ct. 174, 92 L.Ed. 88.

348

10(a) of Executive Order No. 9095, 50 U.S.C.A.Appendix, § 6 note. Furthermore, in the Nationality Act of 1940, 8 U.S.C.A. § 501 et seq., Congress itself defined the term "national" to mean "a person owing permanent allegiance as a *citizen* or a *subject or otherwise* to a state." (Emphasis supplied.) 8 C.F.R. 301.1.

█ The legislative purpose of Section 39 manifestly was to exclude all citizens and subjects of Germany or Japan from recovering property vested in or transferred to the Government after December 17, 1941, in accordance with the provisions of the Act. In the hearings before the Senate Judiciary subcommittee considering the bill (80th Cong.2d Sess., Hearings on H.R..4044, Feb. 17, 19, March 9 and May 11, 1948) p. 233, one witness before the Committee testified that "the effect of this bill would be an extension of the statutory definition of enemies, so as to encompass enemy nationals who lived elsewhere than in enemy or enemy occupied territory." He enumerated several classes of persons who would fall under the proposed Section 39 including (p. 234) "Germans who left Germany possibly long before the war and now live, for instance, in South America or even in this country without having acquired another nationality". To which Senator Cooper replied: "Why should their property be returned to them any more than property returned to Germans in Germany?" A statement filed by another witness appearing in opposition to the bill (pp. 254, 255) pointed out that "The confiscation provisions of the bill do not discriminate between friendly aliens and unfriendly ones." Likewise, in the House of Representatives, Congressman Cox speaking of that section of the bill which was to become Section 39 of the Act, on the floor of the House said (94th Cong.Record, Part 1, 80th Cong, 2d Sess., p. 551): "Many perfectly innocent people will, under the bill, lose their all".

It is significant to note here that this section was enacted as a part of the War Claims Act of 1948, 50 U.S.C.A.Appendix, § 2001 et seq., to provide an initial source of funds for the compensation of eligible United States nationals, and in the light of the foregoing it is evident that Congress was well aware, in enacting this section of the Act, that persons situated as plaintiff is here would be hurt. However, plaintiff argues that Congress did not intend § 39 to be a limitation on §§ 2 and 9(a), but this argument is untenable. Had Congress not so intended it would have been a simple matter for it to have used in § 39 the language employed in §§ 2 and 9(a), but in choosing the term "national" it must be presumed to have intended that that word should be given the meaning which Congress itself had used.

█ Plaintiff relies heavily on the Stadtmuller case, supra, decided in 1926 and the Zander case, supra, decided by our Court of Appeals in 1949. The Stadtmuller case was decided long before the enactment of § 39 of the Act and cannot be controlling here. While reference is made to § 39 in the briefs submitted to the Court in the Zander case by the parties thereto and by the amici curiæ, it should be noted that that case was filed in this Court on March 24, 1948, while § 39 was not passed by the Congress and approved by the President until July 3, 1948. Furthermore, in the Zander case, sight should not be lost of the fact that Mrs. Zander was an American citizen and even though she married a German citizen and was involuntarily detained in Germany during the war, under the Cable Act, 42 Stat. 1022, her American citizenship was preserved. In the instant case, plaintiff was born in Germany and though he lived in Hawaii from 1896 to 1938, so far as the record indicates, he made no attempt to become a United States citizen until November 2, 1949. Without attempting to determine or evaluate the factors, circumstances or reasons why plaintiff, during more than 40 years' residence in Hawaii, never applied for American citizenship, the fact remains that he never renounced his German citizenship, nor attempted to exercise his opportunity to become a citizen of the United States. Having presumably elected to remain a German citizen, he now must bear the responsibilities and consequences of the election which he himself made.

As was held by Kaufman, J., in Schill v. McGrath, D.C., S.D.N.Y.1950, 89 F.Supp. 339: "Section 39 might be considered harsh, and innocent persons may suffer because of it. Indeed, it has even been suggested by one Representative that the bill could be characterized as 'legalized robbery' (94 Cong.Rec. I, supra, p. 551). The Government, however, has the right, under the war power clause of the Constitution (Art. 1, Sec. 8, Cl. 11), to confiscate property of a national of an enemy nation, and this right is not limited by the due process or just compensation clause."

On the point as to whether § 39 of the Act does violence to the Fifth Amendment to the Constitution, it is well to remember that "Rights of the individual, under our federal Constitution and its amendments, are not absolute. When such rights come into conflict with other rights granted for the protection and safety and general welfare of the public, they must at times give way. There is no individual right so absolute that it may be exercised under any and all circumstances, and without any qualification." Ex parte Kanai, D.C., 46 F.Supp. 286, 288.

And, as was said in Henderson v. Kimmel, D.C., 47 F.Supp. 635, 642: "If the Act is an appropriate means to a permitted end there is little scope for the operation of the Due Process Clause."

In the final analysis, this Court must give consideration to the Act as a whole and "The policy as well as the letter of the law is a guide to decision". Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 195, 90 L. Ed. 165.

If the results of this opinion are unduly harsh in their effect on this plaintiff, his remedy and relief must be obtained through the Congress. The provisions of § 39 of the Act as heretofore quoted place him in such a legal status that the affording of relief is outside the sphere of judicial remedy, and solely within the area of legislative remedy.

Plaintiff's Motion for Summary Judgment is denied, defendants' Motion to Dismiss is granted, and counsel will present appropriate Order.